# Richmond.

## ATLANTIC TRUST AND SECURITY COMPANY v. GIRARD FIRE AND MARINE INSURANCE COMPANY.

March 26, 1931.

Present, Campbell, Holt, Epes, Gregory and Browning, JJ.

The opinion states the case.

*Baird, White & Lanning,* for the plaintiff in error.

*Williams, Loyall & Taylor,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

By notice of motion the plaintiff in error claimed $1,000.00 damages, with interest from October 28, 1928, from the defendant in error on account of loss by fire which destroyed a building used as a dwelling, alleged to belong to the plaintiff in error, by virtue of the terms of an insurance policy issued by the defendant in error, on the said dwelling, said policy dated November 23, 1927, and issued as of that date to one Williams, but subsequently endorsed for the benefit of the plaintiff in error, who had purchased the property from Williams.

The policy was procured from the defendant in error through the agency in Norfolk, Virginia, Baldwin Brothers. This firm of insurance agents was composed of four partners, two of whom engaged in a real estate business, which the firm also transacted, and the other two conducted particularly the insurance part of the business. The partner who secured the issuance of the said policy was one William R. Howard, who was constantly in touch with and consulted the general agent of the defendant in error, H. W. Saunders, of Hampton, Virginia. The Baldwins, of the firm of Baldwin Brothers, were officers in the company which is the plaintiff in error.

The said policy of insurance contained the following clause:

"This entire policy shall be void, unless otherwise provided by agreement in writing added hereto, (a) if the interest of the insured be other than unconditional and sole ownership; or (b) if the subject of insurance be a building on ground not owned by the insured in fee simple; or * * * (d) if any change, other than by the death of an insured, take place in the interest, title or possession of the subject of insurance (except change of occupants without increase of hazard)."

The record consisted of the said notice of motion, a plea of tender of the unearned portion of the premium, grounds of defense, an agreed statement of facts, testimony of three witnesses, a contract of sale of the subject of insurance from the plaintiff in error to one Dawley, and a copy of the policy of insurance. Both litigants waived the right to demand a jury and agreed to the submission of the whole matter of law and fact to the court for its determination.

The court, on the 10th day of June, 1929, by its order, entered judgment for the defendant in error, to which judgment this court granted a writ of error.

There are two assignments of error to the ruling of the trial court. The first assignment is that the contract of sale was not susceptible of specific performance and the plaintiff was, after its execution, still the sole and unconditional owner; and second, even if, after the execution of the contract, plaintiff was not the sole and unconditional owner the requirements in respect to the "rider" were waived and defendant was bound.

We do not consider it necessary to discuss the first assignment of error because it is our opinion that the correct decision of the second assignment is determinative of the case.

Counsel for the plaintiff in error, we think, has been rather inapt in choosing as a basis for this defense the term "waiver." We think that the case turns upon the principles of the law of estoppel. This we gather from the evidence and from the

conduct of the parties by their agents. As has already been stated, Mr. Howard was the member of the firm of Baldwin Brothers who handled the insurance transactions, and we here quote from his testimony:

"Q. Just tell the court and jury what understanding, if any, was arrived at in your office in respect to the effect on insurance policies of conditional sales contracts of property of the Atlantic Trust and Security and other companies. * * *

"A. The Girard Fire and Marine Insurance Company was with the firm of Baldwin Brothers approximately twenty years. They operated in Virginia through what is known as a general agent, Mr. H. W. Saunders, of Hampton, being their general agent. Mr. H. W. Saunders and the senior members of our firm, the Baldwins, were very closely associated in business and more or less intimate friends. I came into the firm about ten years ago. Prior to that time my work had been field supervision—title of special agent. I had known Mr. Saunders for a number of years prior to my connection with Baldwin Brothers. In the operations of our business we received, from time to time, both written and verbal instructions from our superiors, as we term them—the special agents and general agents. The general agents distinguished from the special agents, more or less, have supreme power in their territory. We don't know the company at all. All our dealings are done with a general agent. He tells us what we can and cannot do, and he adjusts the losses. In representing a company through the special agent, we have correspondence, and receive instructions, not only from the special agent but from the home office officially. Mr. Saunders being a special agent, we dealt with him entirely. In view of Mr. Saunders' long connection with the office and in view of his friendship, and having some knowledge of my experience, not only Mr. Saunders but other special agents would discuss the various stages of the business from time to time and receive written or verbal instructions to do so and so. In view of the fact

that this was a high grade agency of long standing, the companies, and particularly Mr. Saunders, was very liberal with our office. He said to me on many occasions: 'You know as much about the business as I do.' * * *

"In discussing the other phases of the business, we discussed, on one occasion or more, the question of these conditional sales contracts, and, in discussing that with Mr. Saunders and the other men, explaining the relationship between the Baldwins and the Atlantic Trust and Security Company, explaining how those conditional sales contracts were made, being more or less based upon the payments, not exceeding in any case, I don't believe, the rental of the property, in case the property was rented, and if they complied with every condition of this conditional sales contract they would eventually get title to the property. Now, to prevent unnecessary detail in the office, I asked Mr. Saunders and these men in the office if he thought it necessary to endose those policies payable to— * * *

"Saunders, of course, the general agent for the Girard Fire and Marine Insurance Company; Mr. T. H. DeGraffinreid, special agent of the North British Mercantile Company and allied companies; F. H. Spencer, special agent for Springfield Insurance Company and allied companies; C. T. Lloyd, special agent National Liberty Insurance Company and allied companies; Edward Hunt—he left the field; Lawrence Frazier, special agent for A. H. Turner, special agency; F. H. Briggs, general agent or assistant general agent American Alliance Insurance Company. I believe that is all. Those are the men who had supervision of our office as far as the company was concerned and with which we discussed the various stages of the business from time to time. * * *

"I had discussed with Mr. Saunders on various occasions these conditional sales contracts. He agreed with me that it was not necessary to endorse the policies of his company, the Girard Fire and Marine Insurance Company, showing any

additional ownership under this contract of sale. He further stated after this loss occurred that if he still represented the Girard Fire and Marine Insurance Company he would pay the claim without question, that it was not his idea to take advantage of technicalities.

\* \* \* \* \* \* \* \* \*

"Q. This understanding you speak of was had with Mr. Saunders and the representatives of other companies at the time Mr. Saunders was the State agent of this defendant company?

"A. The general agent.

"Q. And that policy was agreed on in the office and followed?

"A. Yes, sir.

"Q. That was the policy with respect to all these conditional sales?

"A. We had never endorsed any policy as to conditional sales contracts as to which there was a number.

\* \* \* \* \* \* \* \*

"Q. Mr. Howard, when did these conversations take place with Mr. Saunders?

"A. From time to time upon his visits to our office. I could not give any specific date.

"Q. Approximately?

"A. I would say running over the period of the last few years, which was the time the Atlantic Trust and Security Company commenced selling property under those conditional sales contracts."

We are confronted with the proposition that the general agent of the insurance company agreed with the insured's agent that the transaction in question and similar transactions of this kind did not require a "rider" on the policy as they did no violence to the "sole and unconditional ownership" clause of the policy. Due to this agreement on the part of

the general agent the usual "rider" was not attached to the policy in question.

It must be borne in mind that the insured and the insurance agency had been dealing in similar transactions covering a period of time and a course of dealing between them had been established and followed. It will be observed that the agreement referred to between the general agent and the agent of the insured took place at a time prior to the issuance of the policy because when asked when the conversation between himself and Mr. Saunders, the general agent, took place, Mr. Howard answered: "I would say running over the period of the last few years, which was the time the Atlantic Trust and Security Company commenced selling property under those conditional sales contracts."

The witness Howard made this statement on May 24, 1929, in open court and the date of the policy was December 1, 1927, so that a few years anterior to the date of the trial would necessarily be inclusive of the date of the policy.

The following statement in the opinion of the case of *Virginia Fire and Marine Insurance Company* v. *Richmond Mica Co.*, 102 Va. at p. 436, 46 S. E. 463, 465, 102 Am. St. Rep. 846, is applicable to the facts in this case:

"As has been seen, the assured gave full and explicit information with respect to its contract with Mersereau to Lancaster, the general agent of the insurance company, and invoked his superior knowledge, in the light of all the facts, to write a policy which would afford the indemnity sought, and to secure which the premium was paid. Under these circumstances, without the slightest suspicion of bad faith on the part of the assured, the policy in question was prepared and delivered by Lancaster, with the assurance that it met the necessities of the case; and upon that assurance, the assured acted, and parted with the premium. Between the delivery of the policy and the fire, no change had taken place in the status of the property, and not a dollar more of the purchase

price had been paid by Mersereau; and it is conceded that the assured had an insurable interest in the property far greater in value than the amount of the policy. In the face of this undisputed testimony, to permit the insurance company, after loss, to escape liability upon the pretext that one of the general provisions of a printed policy, intended to cover every conceivable case, had been violated, would be in contravention of the decisions of this court from the case of *West Rockingham Insurance Co.* v. *Sheets,* 26 Gratt. (67 Va.) 854, decided in November, 1875, to the latest expression of the court on the subject, found in the case of *Union Assurance Society of London* v. *Nalls,* 101 Va. 613, 44 S. E. 896 [99 Am. St. Rep. 923], decided in June, 1903."

Mr. Vance in his work on Insurance, at page 345, under the heading of Estoppel, says:

■ "Estoppel is an equitable doctrine, enforced for the purpose of preventing one party from taking an unfair advantage of another who has reasonably relied upon his words or conduct. When the insurer has acted in such a way as to give the insured reason to believe that some known right under the policy would not be insisted upon, and the insured has acted upon that belief, the insurer will be estopped to give the lie to his conduct, and claim that right to the prejudice of the insured."

And the same author, in discussing the general topic of contemporaneous waivers, has this to say, at page 359:

"It is in precisely such cases as this that courts of law in modern times have introduced the doctrine of equitable estoppels, or, as it is sometimes called, estoppels *in pais.* The principle is that where one party has by his representations or his conduct induced the other party to a transaction to give him an advantage which it would be against equity and good conscience for him to assert, he would not, in a court of justice, be permitted to avail himself of that advantage. And although the cases to which this principle is to be applied are

not as well defined as could be wished, the general doctrine is well understood, and is applied by courts of law as well as equity where the technical advantage thus obtained is set up and relied on to defeat the ends of justice or establish a dishonest claim."

In Joyce on the Law of Insurance, Vol. 2, at p. 1124, part of section 439, we find the following:

"We deduce, however, the rule, that the tendency of the weight of authority at the present day is against making restrictions in the policy upon an agent's authority conclusive upon the assured and that the company, or any agent with general or unlimited powers, clothed with an actual or apparent authorization, may either orally, or in writing, waive any written or printed condition in the policy, notwithstanding such restrictions, and many cases apply this rule, even though the policy provides that a distinct specific agreement shall be indorsed thereon, or otherwise prescribes a particular mode of waiver or that only certain persons can waive, and there would be no valid reason why if the agent may waive the restriction in the first case he may not in the latter, for such restrictions are declared to be ineffectual to limit the legal capacity of the company to bind itself by waiving conditions of the policy through an agent acting within the real or apparent scope of his authority. So it is held that although the policy may stipulate that a waiver can only be established by a written agreement, indorsed on the policy, yet a waiver by acts *in pais* may be shown by parol testimony.

"Some of the cases, however, rest their conclusions, not upon the ground of a technical waiver, but upon the principle of estoppel by the acts and representations of the company's authorized representative, and in a Michigan case [*Security Ins. Co.* v. *Fay*, 22 Mich. 467, 7 Am. Rep. 670] waiver is declared by the court to be another term for an estoppel and that 'it can never arise by implication alone, except from some conduct which induces action in reliance upon it.' The insurer

may be estopped by the acts and conduct of its agent to defend upon the ground of breach of conditions, notwithstanding stipulations that no agent may waive any condition. But it must be shown that the agent had an actual or apparent authority to waive the provision in question, or some ratification of the act. Such authority of the agent to waive is declared to exist where he has general or unlimited powers or an actual or ostensible authorization, or it may be warranted by a course of business, or it may rest upon the doctrine of estoppel."

We are of opinion that the insurance company, in the immediate case, by the acts and conduct of its general agent is concluded by the law of estoppel from asserting a forfeiture under its policy against the assured.

The judgment of the trial court is reversed and the parties having stipulated that in event the insurance company is liable that the amount of its liability is $1,000.00, we now render the judgment that the trial court should have rendered that the plaintiff in error recover of the defendant in error the sum of $1,000.00 with interest from the 6th day of January, 1929, and costs.

*Reversed.*

EPES, J., dissenting.